REIGELSPERGER, EXRX., APPELLANT, v. POND, APPELLEE.

[Cite as Reigelsperger v. Pond, 3 Ohio App. 2d 266.]

(No. 509—Decided August 25, 1965.)

*Messrs. Spidel, Staley, Hole & Hanes* and *Mr. Lee R. Dabbelt,* for appellant.

*Mr. R. E. Boller* and *Mr. Barrett G. Kemp,* for appellee.

*Per Curiam.* This appeal arises from a verdict by a jury and judgment thereon in favor of the defendant, appellee herein, in a wrongful death action. Plaintiff's decedent was driving a large truck loaded with eggs and was proceeding south on a state route. The defendant was driving a state highway truck and was proceeding north. Immediately after the impact the egg truck caught on fire and plaintiff's decedent and his helper, being the only two persons in the truck, perished. The

defendant claims he has no knowledge of the events immediately preceding the collision. There were no eye witnesses.

One of the appellant's (plaintiff's) assignment of errors is that the trial court erred in permitting Dr. J. W. Crispin to give an opinion not based upon medical probability.

The defendant called his family physician, Dr. J. W. Crispin, who testified that he had practiced since 1947 and had specialized in cardiac or cardio vascular diseases "which the layman ordinarily calls heart trouble"; that the defendant became a patient of his in 1958 when he treated him for angina pectoris "which is a common heart pain"; that at that time his electrocardiogram showed a "coronary artery disease, hardening of the arteries, hardening of the coronary arteries"; that between 1958 and 1961 he was taking medicine off and on, "tablets which was a dilator of the coronary arteries"; that in 1961 he had a back injury and a re-occurrence of angina and pain which kept him off work for a week; that there was no reason to restrict his automobile driving; that he examined him at the hospital after his injuries of February 12, 1962; that he had a concussion and broken ribs; that the electrocardiogram taken that day did not show a heart attack, that it did show an extra beat of the heart about every sixth beat, but this was not in his opinion a result of the accident since no damage occurred to the ribs in the heart area; that in the hospital the defendant told him he had had no pain in the chest prior to the accident but he remembered no details; and that in May, three months after the accident, a coronary thrombosis disabled him for some time.

The doctor was then asked:

"Q. Considering, doctor, his past medical history, the heart disease which he had since 1958, about which you testified; considering your knowledge of the injuries he received in the accident on February 12, 1962; considering the results of the cardiogram that you took on February 12, 1962; considering the treatment after February 12, 1962; and the fact that he had a heart attack some three months later, and your knowledge of that condition; do you have an opinion as to whether or not it was probable that Mr. Pond may have lost consciousness immediately prior to the accident?"

The witness started his answer with the following:

"A Well, let's say that it's within the realm of probability to take a man that has driven all his life and is probably a good driver, pretty stead—"

An objection to this was sustained and the witness continued:

"A (Continued) In other words, you better get on this right—realm of, within the probability that something must have interfered with his realm of consciousness prior to the accident, or he wouldn't have lost control of the car."

An objection to this part of the answer was sustained and the jury instructed to disregard the answer.

The following question was then asked and answered as follows:

"Q Now, will you state what in your opinion may have happened, or did happen?
" * * *

"A Well—it's in my opinion, I feel, I don't know the facts about the driving, I don't know anything about that. All I know is that I feel that if there was any evidence of loss of consciousness here before, loss of—you don't—I don't know how you say it—anyway, I feel like he didn't know what was happening just prior to the accident. Can I say that?"

An objection to this answer was sustained.

The following question was then asked:

"Q Very well. Will you state, in your opinion, whether he probably did or did not lose consciousness immediately before the accident?"

An objection to this question was overruled and the witness answered as follows:

"A Well, I don't know much about that, but in my opinion, Denver was driving down the road and he has hardening of the arteries of the brain, which all people do at this age—
" * * *

"A He has hardening of the arteries of the brain. In other words, anybody at this age has quite a bit of hardening of the arteries of the brain.
" * * *

"A I know—I had a notion to say—but it really, in other words, what I am trying to get at, any weakness of the heart

action or anything can cause a lack of blood to the brain, which gives a loss of consciousness; they actually faint, and it can happen to anybody, and it is more apt to happen at this age because the arteries are already hardened, there is not enough blood to the brain anyway, and any little bit of incult can rob the brain of its blood supply and the patient has a black-out spell. We have all had them, and you have a black-out spell and you can fall over, or you can just shake your head and get better, and it's quite prominent in people of this age to have these spells. They are especially on prolonged standing, the blood leaves the brain, and they will be waiting for the mail, and they fall over because of standing so long. Then from the hardening of the arteries of the brain, the heart action is a little weak, doesn't push the blood into the brain; your pulse is a little weak, you don't get enough blood into the brain, and they have black-out spells; will actually pass out. This happens quite often not only to older persons, but younger persons. Now, back to this, I can't say this happened to this man, but yes, it is within the realm of probability that he had a temporary lack of blood supply to the brain, most likely due to a weakened pumping or weakened heart, but again, it is just within the realm of probability. It is one of those things.''

A motion to strike the answer was overruled.

The following are pertinent excerpts from the cross-examination involving the question before us:

''Q Now, you have in your answer indulged in a good bit of speculation, haven't you, as to conditions out there and so forth? A Probabilities; not—

''Q Probabilities or possibilities? A Both.

''Q What are they, probabilities or possibilities? A I would think at his age it would be probabilities.
   '' * * *

''Q Well, isn't it more probable that he did not black out at that point than it is probable that he did? A No, I think it is more probable that he did black out previous to this.
   '' * * *

''Q Now, in as much this particular individual never had one before and never had one since, why would you say it is more probable that he did have one at that time than he

didn't? A Well, I am trying to explain the seemingly loss of something just prior to the accident, loss of mental powers previous to the accident.

"Q And you are basing that on the fact that he did have an accident and didn't have control of his vehicle, aren't you? A I am basing it on the fact that something must have happened to make him have the accident. In other words, you don't just—

"Q Yes, something must have happened. Now do you say that in accidents that happen, and there are a number of them every day in the state of Ohio—A Yes.

"Q That in a majority of those cases something happens . to a man physically before he has the accident, he has a black out? A More often than we realize, I am sure.

"Q Well, is it more often than not? A I think it is.

"Q You think it is? A Yes sir.

"Q Upon what do you base that? A How else can you explain an accident unless it is a temporary loss of mental faculty? You are not going to run into a fellow if you don't lose something you have that quick.

"* * *

"Q You are rationalizing, are you not, doctor? A No, facts.

"Q No, you are rationalizing. A No, facts.

"Q With respect to accidents in general? A Yes; not rationalizing.

"Q That is a part of your answer? A Theorizing, yes.

"Q Theorizing? A Yes."

At this point counsel for plaintiff moved that the answer be stricken, meaning the answer to the hypothetical question heretofore quoted and given upon direct examination. The following then occurred as shown by the record:

"The Court: The court thinks the witness is confused on your last question, Mr. Spidel, when you said this, I don't think the witness understood that you meant all of his testimony, I think you indicated you meant both on direct examination and cross.

"Mr. Spidel: If the court please, he attributes his conclusions in the first instance that something did happen, and it wouldn't have happened if the man didn't have something

wrong with his mind or if he didn't black out. He theorized on that. He said that was a part of the basis of his answer.

"The Court: Did you mean, Doctor Crispin,—if that is proper—did you mean by your answer to Mr. Spidel's question that you were theorizing when you answered Mr. Boller?

"The Witness: I am theorizing on people of this age group, let's put it that way. I consider our older age groups are most likely due to this type of thing, cerebral asthenia, lack of blood supply to the brain in older age. I am not talking about the young ones so much."

The court did not rule immediately on the motion to strike, but after some further cross-examination, not pertinent here, the court overruled the motion and stated that the jury would be instructed later on the use of the hypothetical question.

The last question put to the doctor before his long answer was "whether he probably did or did not lose consciousness immediately before the accident" and his conclusion was that it was "within the realm of probability that he had a temporary lack of blood supply to the brain." While this answer may not be entirely responsive to the question the doctor did say as part of his answer that "lack of blood to the brain * * * gives loss of consciousness."

However the refusal of the court to strike the answer from the record and instruct the jury to disregard it was prejudicial error. On cross-examination the doctor stated he was basing his answer "on the fact that something must have happened to make him have an accident" and "How else can you explain an accident unless it is a temporary loss of mental faculty."

The expert medical testimony here was offered by the defendant to enable the jury to conclude that there was no negligence on the part of the defendant due to his being unconscious immediately prior to the collision. However, it is apparent from the testimony of the medical expert, both on direct and cross-examination, that he was arriving at the conclusion that the defendant was probably unconscious because the collision occurred. He made the collision the basis of his belief of unconsciousness, rather than the unconsciousness the explanation of the collision. This type of reverse reasoning made his opinion testimony incompetent.

His answer was based upon his own conclusion that the

defendant was not negligent, and was further partly based on his opinion and statements, made before his answer, to which objections had been sustained and which the jury had been instructed to disregard.

Such an opinion is worthless so far as the jury question involved here is concerned, and to permit the witness to speculate in this manner before the jury is prejudicial error.

A majority of this court find all other assignments of error, except refusal to grant a new trial, to be not well taken. The judgment is reversed and the cause remanded for new trial.

*Judgment reversed.*

YOUNGER, P. J., GUERNSEY and MIDDLETON, JJ., concur.

YOUNGER, P. J., dissenting in part. I concur entirely in the foregoing opinion of the court and in reversing the judgment and remanding the case for a new trial. However, I dissent from the finding that the other assignments of error are not well taken. Assignment number one is "error in impaneling the jury." This assignment, in my opinion, is well taken.

The record shows that at the start of the impaneling of the jury the court directed the clerk to seat thirteen prospective jurors, using the alternate juror's seat. At this point a question was raised and it was agreed between both counsel and the court that as a prospective juror was dismissed the thirteenth juror should move to the seat vacated and the next venireman on the list should take the thirteenth seat and that the "13th juror should not be qualified until after the first twelve have been sworn." This latter part was subsequently ignored, as at the conclusion of the peremptory challenges all thirteen jurors were sworn together and no opportunity was given by the court to either counsel to exercise peremptory challenges as to the thirteenth juror. Section 2313.37, Revised Code, provides that if an alternate juror is deemed necessary such juror shall be selected after the jury has been impaneled and sworn in the same manner as the regular jurors and each party is entitled to two peremptory challenges.

After the thirteen prospective jurors were seated counsel inquired of all of them for cause, and a number were excused

for cause. As each prospective juror was excused for cause the prospective juror in seat 13 was moved to the seat vacated and another prospective juror was called and placed in seat 13. This process continued until all thirteen jurors were passed for cause.

Thereupon the court stated:

"The Court: Thank you. Then the jury is with the plaintiff for peremptory, first peremptory challenge."

Mr. Spidel then excused Mr. Stalder, prospective juror No. 8, and the prospective juror Kuhn was moved from seat 13 to seat 8, and seat 13 was then filled by prospective juror Gerald Collins.

Mr. Spidel then examined Mr. Collins, followed by Mr. Boller. Mr. Boller than examined Mr. Kuhn, prospective juror No. 8. Upon passing for cause the court announced:

"The jury is with the defense for its 1st peremptory.

"Mr. Boller: We will excuse Mr. Urban Mescher."

He was prospective juror No. 10, and Mr. Collins was moved from seat No. 13 to seat No. 10, and Mrs. Tangeman was seated as No. 13. She was examined by Mr. Spidel, and both counsel passed for cause. The court then stated:

"Thank you. The jury is with the plaintiff for its second peremptory challenge.

"Mr. Spidel: We pass perempt.

"The Court: The jury is with the defendant for its second peremptory challenge.

"Mr. Boller: We will excuse Mr. Louis J. Heyne."

Mr. Heyne, prospective juror No. 12 was excused, and Mrs. Tangeman moved from seat No 13 to seat No. 12, and Mr. Rinderle was seated as prospective juror No. 13, and he was examined for cause and both counsel passed for cause. Thereupon the court announced:

"The jury is back with the plaintiff for its 3rd peremptory challenge.

"Mr. Spidel: We pass the jury.

"The Court: The jury is with the defense for its 3rd peremptory challenge.

"Mr. Boller: The defendant accepts the jury."

At this point, both parties having passed, the court could have announced that a jury had been selected. But being able

and experienced, the trial judge followed the well-known and old rule that, as long as neither party had exhausted the number of peremptory challenges it was entitled to, the matter should be left open as long as reasonable; and that, while the parties should not be permitted to pass back and forth indiscriminately in an attempt to see what the adversary will do, a fair and reasonable latitude should be observed to the end that a fair and impartial jury may be secured. The court then continued:

"The Court: To keep the count, do you pass your 4th peremptory, Mr. Spidel?

"Mr. Spidel: How is that?

"The Court: You pass your 4th?

"Mr. Spidel: We pass 3, yes.

"The Court: It is with you for the 4th."

Thereupon, Mr. Spidel further examined prospective juror No. 10, at the conclusion of which Mr. Spidel excused Mr. Collins and Mr. Rinderle was moved from seat No. 13 to seat No. 10. Mr. William J. Maehlmann was then called as prospective juror No. 13 and examined by Mr. Spidel, and both counsel passed for cause. Whereupon the court stated: "The jury is with the defense for its last peremptory challenge," and the defense excused Mr. Deitsch, prospective juror No. 1; Mr. Maehlmann No. 13 was then seated as juror No. 1, and Glen Florence, Jr., was called as prospective juror No. 13 and examined by Mr. Spidel and by Mr. Boller, and both passed for cause. Thereupon the court announced:

"Gentlemen, we have a jury, according to my count. Any objection to having the jury sworn at this time?"

"Mr. Boller: None.

"Mr. Spidel: I would like to ask a couple questions of Mr. Maehlmann."

This examination brought out the fact that Mr. Maehlmann, an assistant manager of a local building and loan association, knew two of the attorneys and that one of the attorneys for the defendant, Mr. Kemp, of St. Marys, had made a few title reports to his company for their local attorneys in Celina. At the conclusion of this examination the following occurred:

"Mr. Spidel: If the court please, we would like to bring a peremptory against this juror.

"Mr. Boller: Peremptory has been exhausted, your Honor.

"The Court: Wait a minute, just wait a minute. You passed your final?

"Mr. Spidel: I passed, but I still have the right to exercise an extra peremptory. I still have those peremptories left. I passed at the time.

"Mr. Boller: I would object to such procedure, your Honor. I feel that they have passed for peremptory and permitted this juror to take his seat and already has the 13th or alternate juror. Peremptory challenge has been passed.

"The Court: The court rules against you, Mr. Spidel. The jury will remain seated.

"Mr. Spidel: Exceptions.

"The Court: You either exercise them or pass them; they are marked off.

"Mr. Spidel: Note exceptions.

"The Court: Any objection now to swearing this jury.

"Mr. Boller:: None.

"Mr Spidel: We object for the reason that we haven't exhausted all our peremptory challenges.

"The Court: Very well, the jury may stand, raise your right hand, including the 13th juror."

Thereupon the thirteen jurors were sworn in as a group.

The court in ruling against the challenge of Maehlmann and in its subsequent statement that "You either exercise them or pass them; they are marked off" held, that although plaintiff was entitled to exercise four peremptory challenges, such challenges had been exercised by excusing two jurors and passing twice. At the time this challenge was made there were two new jurors in the box, Maehlmann and Rinderle, who were not in the box at the time plaintiff had last passed.

It was held in *Koch* v. *State*, 32 Ohio St. 352, that "when the juror Rice was called into the panel, it was a new jury, and the defendant, having up to that time exercised but one peremptory challenge, had the legal right to peremptorily challenge any one of the jurors. The denial of this right was error."

In the syllabus in the case of *Lyon* v. *State*, 116 Ohio St. 265, it was held "nor is it error for the court to require that an omission to challenge peremptorily or a waiver of such challenge shall have the same effect as the exercise of the

right." However, as stated on page 271 in the opinion, at the beginning of the trial the court made the following statement:

"I think we will now stipulate, at this time, the rule that will be applied, with reference to the exercising of peremptory challenges. That rule will be that the defendant will exercise four, or be charged with four challenges by the court, first. And then the state exercise one, or be charged with one.* * *"

Therefore, in the *Lyons case* counsel knew at the start of the trial that the passing of a peremptory challenge would be charged against them the same as the exercise thereof. Not so in the case before us. It is true that the court stated to plaintiff's counsel that the jury was with the plaintiff for the "first peremptory challenge," "for a second peremptory challenge," "for its third peremptory challenge" and "it is with you for the fourth." In my opinion this did not advise counsel that the court was going to make it its ruling that the passing of a challenge would be the equivalent of exercising it, and when the court did announce the rule it had the effect of being retroactive.

The refusal of the challenge to Mr. Maehlmann resulted in placing the plaintiff in an embarrassing and unfair position under the subsequent ruling of the court. The challenge to Mr. Maehlmann being refused, he remained upon the jury which heard the case.

Whether this prejudiced Mr. Maehlmann is beside the point. It had the capacity for doing so. And if plaintiff was not permitted his allotted peremptory challenges prejudicial error intervened as a matter of law

" * * * Moreover, it has been held that the denial of a right of peremptory challenge is prejudicial per se and harmful, and a party is not required to make an affirmative showing that the denial of his right resulted in prejudice and injury to his cause; and the test is not whether the denial actually influenced the result, but whether it had the capacity for doing so." 5A Corpus Juris Secundum 833, Appeal & Error, Section 1708.

It is, therefore, my opinion that the refusal of the trial court to allow the peremptory challenge to juror Maehlmann was error prejudicial to the plaintiff.

GUERNSEY, J., concurring. In view of the dissenting opinion of my associate, Judge Younger, I believe that some explanation should be given why this member of the court is of the opinion that the assignment of error as to the empaneling of the jury is not well taken.

It should be first observed that the claim under this assignment is that the plaintiff was prejudiced, not by being deprived of any right to exercise a peremptory challenge against the thirteenth juror, but by being denied a peremptory challenge against the first juror. In my opinion this claim of prejudicial error is not well taken for at least two reasons.

First, I am of the opinion that the case of *Lyon* v. *State*, 116 Ohio St. 265, is controlling on the facts here. It will be noted in the first paragraph of the syllabus of the *Lyon case* that the Supreme Court determined, "nor is it error for the court to require that an omission to challenge peremptorily or a waiver of such challenge shall have the same effect as the exercise of the right." This is exactly what was required by the trial court here. We are not informed whether the trial court had a formal rule pertaining to the selection of juries, which imposed this requirement. If it did, counsel was charged with the requirements of such rule. But even in the absence of a formal rule it was made apparent by the trial court to counsel, from the first, that the court was imposing a rule that passed challenges were being deemed waived, and, having such notice, counsel would proceed to pass same thereafter at the peril of losing such challenges.

Secondly, the following transpired after counsel for plaintiff had passed all of the jurors, including the 13th juror, for cause:

"The Court: With the defense for cause.

"Mr. Boller: We pass for cause.

"The Court: The jury is back with the plaintiff for its 3rd peremptory challenge.

"Mr. Spidel: We pass the jury.

"The Court: The jury is with the defense for its 3rd peremptory challenge.

"Mr. Boller The defendant accepts the jury."

At that point there was a complete twelve-man jury, and a 13th juror, passed by the plaintiff and the defendant both

278

for cause and peremptorily. At that point Maehlmann had not been seated, either as one of the twelve jurors or as 13th juror. The seating of Maehlmann came about only because counsel for plaintiff ignored the fact that a jury had been obtained and proceeded to reopen the examination of the jury, thus himself bringing about the situation of which he now complains. He may not successfully complain of invited error, if error it be.

MIDDLETON, J., concurs in the foregoing concurring opinion.